**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3365-24

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RAFAEL HIDALGO,

     Defendant-Appellant.

_____

> Argued June 3, 2026 – Decided July 29, 2026
>
> Before Judges Paganelli and Jacobs.
>
> On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 23-12-1558.
>
> Rachel Glanz, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Rachel Glanz, of counsel and on the briefs).
>
> Penelope Mary Way, Assistant Prosecutor, argued the cause for respondent (Wayne Mello, Hudson County Prosecutor, attorney; Penelope Mary Way, of counsel and on the brief).

PER CURIAM

Defendant Rafael Hidalgo appeals from a January 13, 2025 order denying his motion to suppress physical evidence recovered following his arrest and from the June 16, 2025 judgment of conviction entered following his guilty plea to unlawful possession of a handgun. We affirm.

I.

On May 9, 2023, the West New York Police Department issued a "Be On the Lookout" (BOLO) for defendant as a suspect in a vehicle theft. The BOLO included a photograph of defendant wearing his hair in dreadlocks. Two days later, a warrant was issued for defendant's arrest. On May 12, police issued an updated BOLO:

> Presently, [defendant] has been subjected to complaint warrant 0912 W 2023 000222.
>
> Law enforcement personnel are urged to exercise caution due to an unverified report from the victim suggesting that [defendant] may be in possession of a handgun. It should be noted that [defendant] has previously faced charges related to the unlawful possession of a firearm.

On May 26, while patrolling near 60th Street and Buchanan Place, Officer Rigo Mendoza observed an individual riding an electric bicycle whom he recognized from the BOLO photograph. Officer Mendoza attempted to stop the suspect by activating his patrol vehicle's lights and sirens and ordering him to

2

stop. Instead, defendant fled on the bicycle. Officer Mendoza then pursued on foot for several blocks before losing sight of him. He radioed a description of a male with dreadlocks, wearing a red hooded sweatshirt, black jeans, a black N95 mask, and riding an electric bicycle.

Other officers apprehended defendant shortly thereafter. By the time of his arrest, however, defendant was no longer wearing the red hooded sweatshirt. Surveillance video obtained by police and played at the suppression hearing showed defendant parking his bicycle in what officers alternately described as an "alley" or "alleyway." Defendant is seen removing his hoodie, wrapping a firearm in it, and tossing the hoodie with the firearm onto the roof of a nearby residential garage. He then exits the frame wearing a white sleeveless T-shirt. After the arrest, police recovered defendant's bicycle, a fanny pack, two bags containing a controlled dangerous substance (CDS), and the N95 mask from the alley. From on top of the garage, police also recovered the hoodie with the firearm concealed inside, a scale, and a white powdery substance, subsequently confirmed as a CDS.

A Hudson County grand jury returned an indictment charging defendant with eleven counts, including second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); third-degree possession with intent to distribute CDS in a

school zone, N.J.S.A. 2C:35-7(a); second-degree possession of a handgun while committing a drug offense, N.J.S.A. 2C:39-4.1(a); and fourth-degree obstructing administration of law ("by means of flight, by ignoring verbal commands to stop, and obstructing the detection or investigation of a crime"), N.J.S.A. 2C:29-1(a).

Defendant moved to suppress the physical evidence, arguing the stop and seizure were unconstitutional because Officer Mendoza lacked reasonable suspicion to justify the stop and the subsequent pursuit constituted an unlawful seizure. Judge Carlo Abad conducted a hearing in September 2024 and heard oral argument in January 2025.

At the suppression hearing, Officer Mendoza testified he was familiar with the BOLO as it was posted "just [about] a month prior to the incident . . . [a]nd then every day during lineup we would brush up on it and see it and see that person of interest." Officer Mendoza estimated he had seen the BOLO more than ten times, was aware of the active warrant, and recognized the suspect by his distinctive dreadlocks protruding from his hoodie, despite defendant wearing a face mask. Officer Mendoza described defendant's flight and testified he pursued him on foot before losing sight of him as he fled on the bicycle. Officer Mendoza further testified that after other officers apprehended defendant, he

returned to the scene of the arrest, positively identified defendant, and advised defendant of the open arrest warrant.

Officer Michael Mendez testified he assisted in canvassing the area after Officer Mendoza's pursuit, ultimately locating the suspect. He asked a resident on a neighboring balcony if he had seen "anything red on top of the garages and he said, 'Yeah. There's something red up there[.]'" Detective Chris Ortiz testified he served as the lead detective, created the BOLOs, and confirmed the suspect's identification and open warrant, later documenting the recovery of the items from the alley, and obtaining surveillance footage showing the suspect discarding evidence.

Defendant argued Officer Mendoza identified him solely by his dreadlocks, a feature common to many individuals, and that the BOLO lacked sufficient detail. Defendant also contended the abandonment of evidence was a direct result of an unlawful stop, and thus, the evidence should be suppressed as fruit of the poisonous tree.

The State maintained Officer Mendoza had reasonable suspicion to stop defendant. The BOLO included a photograph depicting defendant's distinctive "big dreadlocks," as Officer Mendoza characterized them, which he perceived "protruding through the hoodie." The State further argued Officer Mendoza was

5

justified in pursuing defendant, having recognized him and knowing there was a warrant for his arrest. Defendant's flight added to the reasonable suspicion and the evidence recovered was voluntarily abandoned during a lawful pursuit.

In a written decision and accompanying order, Judge Abad denied the motion to suppress. Among his findings, he wrote:

> The BOLO, while general in some respects, described . . . [d]efendant's dreadlocks and included a photograph, which Officer Mendoza reasonably relied upon to match the individual he observed. . . . [T]he [c]ourt finds that the combination of the photo and . . . [d]efendant's appearance, behavior, and decision to evade police created sufficient particularized suspicion under the constitutional standard. Importantly, the fact that . . . [d]efendant fled further corroborated Officer Mendoza's suspicion as flight is a relevant factor in assessing reasonable suspicion.

The judge distinguished the case from State v. Crawley, where the Supreme Court compared the facts to those of Florida v. J.L., in which "police received a tip from an anonymous caller" and later saw a person "matching the [generalized] description, and, based on nothing more than [an] anonymous tip, approached and frisked the suspect." 187 N.J. 440, 451 n.5 (2006) (citing Florida v. J.L., 529 U.S. 266, 268 (2000)). The judge stated:

> The present case differs significantly [from Crawley] because the BOLO for . . . [d]efendant was much more specific, as it included a photograph. Officer Mendoza testified that he reviewed the BOLO

6

multiple times and identified . . . [d]efendant from the image. This visual identification, combined with his knowledge of the active warrant, provided a robust and individualized basis for the stop. Here, unlike in Crawley, Officer Mendoza's actions were based not only on a general description but on a direct connection between . . . [d]efendant's image in the BOLO and his presence on the scene.

After concluding the investigatory stop was constitutionally sound, the judge addressed abandonment:

The surveillance footage, which continues for minutes, and immediately follows officers' pursuit of . . . [d]efendant, shows that . . . [d]efendant's abandonment was not a reflexive or involuntary act but a conscious decision to dispose of incriminating evidence during a lawful pursuit. . . . The footage shows that . . . [d]efendant rode on his bike into the corner of an empty parking lot, where he hid behind a brick wall that obstructed any potential viewers for a period of approximately fifty seconds. . . . After removing his red hoodie, . . . [d]efendant looks around to see if anyone is around and then pulls something out of his pants pocket. . . . After this, . . . [d]efendant puts his hair up and appears to put something inside of the red hoodie he had just removed. . . . Finally, . . . [d]efendant throws his hoodie on the roof, throws another object, and walks out of the parking lot, leaving the bike he rode in on in the corner by the brick wall.

Judge Abad rejected defendant's claim that unlawful police conduct coerced the abandonment. Rather, the judge found the officers lawfully pursued defendant based on reasonable suspicion arising from recognition and

7

knowledge of an outstanding warrant. In the absence of police misconduct, the judge also found defendant voluntarily discarded the firearm and CDS during a lawful pursuit. Accordingly, the judge denied defendant's suppression motion.

Following denial of the motion, defendant pleaded guilty to second-degree unlawful possession of a handgun. In June 2025, the court sentenced defendant to a five-year imprisonment term, subject to a forty-two-month period of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c). The remaining counts of the indictment were dismissed.

On appeal, defendant argues:

> SUPPRESSION IS REQUIRED BECAUSE POLICE LACKED REASONABLE ARTICULABLE SUSPICION FOR THE INVESTIGATORY STOP AND THE STATE FAILED TO PROVE THAT THE EVIDENCE WAS ABANDONED.
>
> A. The Investigatory Stop Was Not Supported By Reasonable And Articulable Suspicion Of Criminal Activity.
>
> B. The State Failed To Prove Abandonment.[1]

---

[1] We consider the more expansive arguments made in defendant's reply brief to address the State's argument that defendant abandoned the suppressed property and thus had no standing to argue against its admission.

II.

Our scope of review of a decision on a motion to suppress "is limited." State v. Ahmad, 246 N.J. 592, 609 (2021) (citing State v. Robinson, 200 N.J. 1, 15 (2009)). "Generally, on appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings are supported by sufficient credible evidence in the record.'" State v. S.S., 229 N.J. 360, 374 (2017) (quoting State v. Gamble, 218 N.J. 412, 424 (2014)). We defer to those factual findings in recognition of the trial court's exclusive "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). However, "[o]ur review of legal matters is de novo." State v. Radel, 249 N.J. 469, 493 (2022) (quoting State v. Hathaway, 222 N.J. 453, 467 (2015)).

Terry Stop

The Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution protect against unreasonable searches and seizures. Ibid. Warrantless stops are presumptively invalid unless justified by an exception, such as an investigatory stop based on reasonable and articulable suspicion. See Terry v. Ohio, 392 U.S. 1, 20-22 (1968); State v.

Rodriguez, 172 N.J. 117, 126-27 (2002). It is well established that the mere act of leaving police presence, even by running away, cannot alone, without any other factor, legitimately produce the articulable suspicion required to validate a Terry stop. See State v. Dangerfield, 339 N.J. Super. 229, 237 (App. Div. 2001) (mere departure of the defendant by bicycle upon spotting a police officer did not justify a stop where the officer could not articulate an objectively reasonable basis for suspicion of criminal activity); State v. Tucker, 136 N.J. 158, 169 (1994) (flight alone, without other articulable suspicion of criminal activity, does not meet the Terry standard for articulable suspicion).

Obversely, flight in conjunction with other circumstances can create reasonable suspicion for a stop. See State in Interest of J.B., 284 N.J. Super. 513, 518 (App. Div. 1995) ("[F]light under the compelling circumstances before us was sufficient to justify further investigation and, if necessary, investigatory detention."); State v. Doss, 254 N.J. Super. 122, 130 (App. Div. 1992) (By "continu[ing] his flight from the pursuing police officers despite their shouted orders to halt, his refusal to obey their orders, together with all of the other circumstances of the case, [defendant] gave the police reasonable cause to believe that he had committed or was then committing a criminal offense.").

10

With these principles in mind, we perceive no error in the trial court's finding that Officer Mendoza's "visual identification" of defendant from the BOLO, "combined with his knowledge of the active warrant" for defendant's arrest, provided a reasonable suspicion sufficient to validate a basis for the stop. These considerations were articulated through the testimony of Officer Mendoza:

> [OFFICER MENDOZA:] That day, in particular, is when I . . . observed an individual who was wanted out of our jurisdiction.
>
> [ASSISTANT PROSECUTOR:] And when you say "wanted," what do you mean?
>
> [OFFICER MENDOZA:] I mean there was a previous incident that had occurred and due to that incident the victim came in and wanted to proceed forward with pressing charges. So . . . detectives eventually after the incident explained the generating of a warrant for that individual. And that was broadcast through our departmental e-mail, in other words, a BOLO, which means be on the lookout. And that stands for any one of interest, a vehicle of interest, anything of that interest.

On direct examination, Officer Mendoza testified he had viewed the BOLO "north of 10 times" before the date of arrest. On cross-examination, he reiterated that positive identification of the suspect, combined with the BOLO, constituted the basis for arrest:

11

[DEFENSE COUNSEL:] Okay. Now, you testified earlier that you stopped this person solely because you suspected that they were the person in the BOLO. Right?

[OFFICER MENDOZA:] I was attempting to stop him.

[DEFENSE COUNSEL:] Right.

[OFFICER MENDOZA:] So because he was the person on the BOLO, yes.

Officer Mendoza testified he was able to recognize defendant, in part, because his "big . . . dreadlocks were protruding through the hoodie." The judge credited Officer Mendoza's testimony that he was able to recognize defendant from the BOLO photograph and his dreadlocks. In this respect, we defer to the judge's credibility findings. See S.S., 229 N.J. at 374. On de novo review, we are satisfied the officer's recognition, combined with information about an active warrant for defendant's arrest, made it reasonable for the officer to stop defendant.

Lastly, we reiterate flight alone does not create reasonable suspicion but is a relevant factor when combined with other circumstances. J.B., 284 N.J. Super. at 518; Doss, 254 N.J. Super. at 130. Defendant's immediate flight after the attempted stop "adds weight to the [officer's] already existing reasonable articulable suspicion." State v. Citarella, 154 N.J. 272, 281 (1998).

12

Abandonment

"[A] defendant has automatic 'standing to move to suppress evidence from a claimed unreasonable search or seizure if he has a proprietary, possessory or participatory interest in either the place searched or the property seized.'" State v. Carvajal, 202 N.J. 214, 222 (2010) (quoting State v. Johnson, 193 N.J. 528, 541 (2008)) (internal quotation marks omitted). However, "a defendant will not have standing to object to the search or seizure of abandoned property." Id. at 223 (quoting Johnson, 193 N.J. at 548-49). "[F]or standing purposes, property is abandoned if: (1) a person has either actual or constructive control or dominion over property; (2) he knowingly and voluntarily relinquishes any possessory or ownership interest in the property; and (3) there are no other apparent or known owners of the property." Id. at 225.

"The State bears the burden of proving 'by a preponderance of the evidence that the defendant abandoned the property and therefore has no standing to object to the search.'" Id. at 223-224 (quoting Johnson, 193 N.J. at 548 n.4). For reasons that follow, we are satisfied the State sustained its burden that defendant did not have standing to object to the search.

A-3365-24

Regarding the first factor, defendant concedes that by throwing the sweatshirt containing the gun on a garage rooftop, he no longer had actual or constructive control or dominion over the property.

Defendant maintains, however, he did not knowingly relinquish any possessory or ownership interest in the property because, by secreting it, he had the express intention to retrieve it at some future point. Defendant argues:

> The fact that [he] stashed the drugs and firearm in a <u>private</u> place, as opposed to a public one, demonstrates an intent to return and retrieve them at a later point. [Defendant] could have disposed of both items anywhere else -- on the sidewalk or in a gutter, for instance -- but he chose to store them in a private, protected place. Not only that, but he took steps to hide both from the view of others who may be in the vicinity.

We disagree. To determine whether a suspect voluntarily and knowingly relinquished their interest, courts "apply a totality-of-the-circumstances analysis." <u>Id.</u> at 227. Under this standard, "knowingly" means acting "with a conscious understanding" of one's actions, while "voluntarily" means acting "with a free and unconstrained will . . . that is not overborne by physical or psychological duress or coercion." <u>Id.</u> at 226-27 (first citing <u>Black's Law Dictionary</u> 950 (9th ed. 2009); then citing <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225, 227 (1973)).

14

A suspect's conscious decision to throw—not "stash"—a sweatshirt containing contraband onto a roof during a chase is legally distinct from an involuntary act. Judge Abad found:

> The surveillance footage conclusively shows . . . [d]efendant removing his red hoodie, wrapping the firearm in it, and discarding it on the roof of a garage. . . . These deliberate actions display that . . . [d]efendant had the necessary intent to relinquish control of the property.
>
> The surveillance footage, which continues for minutes, and immediately follows officers' pursuit of . . . [d]efendant, shows that . . . [d]efendant's abandonment was not a reflexive or involuntary act but a conscious decision to dispose of incriminating evidence during a lawful pursuit.

We have recognized that when a person leaves an item unattended in an outdoor space while reacting to police, the item is considered relinquished. See State v. Farinich, 179 N.J. Super. 1, 4-6 (App. Div. 1981) ("In the context of the Fourth Amendment a defendant 'abandons' property when he voluntarily discards, leaves behind or otherwise relinquishes his interest in the property in question so that he can no longer retain a reasonable expectation of privacy with regard to it at the time of the search."). "[F]leeing from police in a public place expresses an intention to create distance between the actor and the property left behind and -- in the absence of evidence to the contrary -- without an intention

15

to reclaim the property." State v. Gartrell, 256 N.J. 241, 254 (2024).  Because we have determined the police pursuit here was lawful—predicated on an identification and active warrant—the pursuit itself does not render the abandonment involuntary or coerced.  See Carvajal, 202 N.J. at 228.  Thus, defendant's conscious choice to dispose of the incriminating evidence during flight satisfies the requirement of a knowing and voluntary relinquishment.

Moreover, we reject the contention that because the contraband landed "in a private place, as opposed to a public one, [this] demonstrates an intent to return and retrieve them at a later point."  First, although it is certainly true defendant could have disposed of the gun and drugs "anywhere else," there is no concrete evidence in the record to convincingly support the supposition that defendant's intent was to store the contraband in "a private, protected place" for later return and retrieval.  From the totality of the circumstances, it is more plausible defendant's intent was to hide the contraband such that it was never retrieved, by defendant or, more pressingly, the police.

Second, the video shows that by virtue of his chosen retreat point defendant was effectively boxed in an alleyway or "parking lot" as Judge Abad described the area.  No plainly public place, such as a sidewalk or a gutter, was anywhere in view.  Defendant's intent may be further discerned by noting he

A-3365-24

tossed the contraband well above eye level, wrapped in a garment, thus attenuating its illicit nature. There is therefore no persuasive evidence defendant intended to ever retrieve the contraband and every indication he knowingly and voluntarily relinquished any possessory or ownership interest in the property.

Third, we question whether the "alleyway" is more accurately described as a "driveway," as defendant repeatedly references in his reply brief. Defendant wrote:

> Although the testifying officers referred to the driveway as an "alley," the [body-worn camera] footage reveals that it is not a throughway for the public but instead a parking area for residents. Not only is there a fence at the back that prevents traffic from passing through, but also two large signs clearly state that the area is private property and that non-residents who park there will be towed. . . .

We note none of the three State's witnesses were challenged as to their description of the subject space as an alleyway as opposed to a driveway. Again, Judge Abad twice referred to the area where defendant took refuge as a "parking lot." Trial counsel did not request—nor did the judge render— a finding whether the parking lot or garage rooftop was a public, private, quasi-public, or semiprivate area. Further, there was no testimony regarding ingress or egress, or the referenced signage, so that one might objectively discern the public or private nature or scope the subject area. We do know with certainty that the

17

neighbor who spotted the red hoodie from an adjacent balcony had direct visual access to the contraband.

Therefore, notwithstanding defendant's claim he did not intend to relinquish ownership, we concur with Judge Abad's conclusion that defendant discarded the contraband in a publicly accessible setting, where he could not reasonably retain a continued expectation of privacy.

Although we no longer apply the expectation of privacy test, based on the facts here, defendant's intention to reclaim the property is no more evident than his obvious intention to minimize penal exposure by disguising it from recognition and recovery, putting as much distance as possible between himself and the contraband. See Gartrell, 256 N.J. at 254; Johnson, 193 N.J. at 548-49.

In State v. Burgos, we addressed "the issue of a criminal suspect's right of privacy in a narcotics stash maintained in open view on a public street." 185 N.J. Super. 424, 425 (App. Div. 1982). The defendant, similar to defendant here, contended "the proper course of action would have been to obtain a search warrant from a magistrate and then open the [stashed] tin." Id. at 426. Finding the "case to be simply another variation on the recognized theme of abandonment of personal property for purposes of constitutionally protected privacy[,]" we held the "defendant had no protected Fourth Amendment rights

in the narcotics stash maintained remotely from his person." Id. at 426-27. The same holding applies here, except to note the property was not thrown on a public street but instead on a rooftop, openly visible to neighboring residents.

Regarding the third factor under Carvajal, there is no evidence to suggest another had apparent ownership or possessory interest in the sweatshirt or its contents.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division